# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-4440
_____

CHARLES T. NEWCOMB,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Columbia County.
Wesley R. Douglas, Judge.

September 9, 2019

ROWE, J.

Charles T. Newcomb appeals his conviction for conspiracy to commit first-degree murder. He raises four arguments for reversal. We affirm on all four arguments and write only to address his argument challenging the trial court's denial of his motion for judgment of acquittal.

## *Background*

The charges against Newcomb stemmed from an FBI investigation into the activities of the Ku Klux Klan in the St. Augustine area. The FBI's domestic terrorism task force recruited a civilian confidential informant to infiltrate the Klan. The CI

joined one of the three area chapters and obtained a high-level security position in the Klan by inflating his military credentials.

At a Klan gathering in December 2014, Newcomb, David Moran, and Thomas Driver approached the CI. The men asked the CI to help them plan the murder of a man who had assaulted Driver. Based on this conversation, the FBI equipped the CI with electronic devices to record his interactions with the three men. The recordings of several interactions led to charges against the three men for conspiracy to commit first-degree murder. Driver entered a plea. Newcomb and Moran went to trial.

*Trial*

At trial, the CI testified that Newcomb, Moran, and Driver first approached him about the murder plot during a Klan gathering. Moran told the CI that Driver needed his help. Driver explained that he was a corrections officer and that a man bit him during an altercation in the prison. Driver showed the CI a picture of the man. Driver said that the man tested positive for Hepatitis C.  Blood tests first showed that the man transferred the disease to Driver. Driver learned months later that the test produced a false positive. He had to undergo months of unnecessary blood work.

Newcomb and Moran told the CI that they wanted him to do something about Driver's attacker, who had been released from prison. The CI asked Moran and Driver if he should beat up the man. They were not interested in a beating. The CI asked if they wanted the man "six feet under." Moran and Driver looked at each other, and then responded affirmatively. Next, the CI asked Newcomb if he wanted the man "six feet under," and Newcomb had the same response. The CI reported the conversation to the FBI. The FBI asked the CI to record future conversations with Newcomb, Moran, and Driver. Recordings of the interactions that follow were admitted into evidence and played for the jury.

First, the CI and Newcomb discussed what they needed to do about the attack on Driver. Newcomb called the attack "attempted murder." Newcomb expressed that he and Moran wanted to handle the situation without Driver's involvement. He stated that any

action taken against the attacker should occur when Driver was at work so Driver would have an alibi. Newcomb volunteered to help locate the man and stated that he "could walk right up and put him out of his misery."

Two weeks later, Newcomb asked the CI if he was available the next weekend to take care of Driver's problem. Newcomb told the CI that Moran said that he would join them. The CI agreed to join them. The CI also reported to Newcomb that he found the attacker's home in Palatka and that a river was nearby. Newcomb asked if they were "just going to snatch him up right there and take him to the river or how are we going to work this?" He also told the CI that he planned to buy several items to protect them from contracting Hepatitis C from the attacker.

The next weekend, the CI arranged to meet Moran and Newcomb at Newcomb's house. The three planned to drive to Palatka to find Driver's attacker. The CI arrived at Newcomb's house before Moran. Newcomb informed the CI that he cleaned some ammunition so it would not have any fingerprints on it. He also revealed that he had a cooler containing several bottles of his wife's insulin. He proposed killing Driver's attacker by injecting him with insulin, then dumping the body into the nearby river. He thought they should bring a fishing pole to place near the man's body to make it appear that the man died while fishing.

When Moran arrived, the three men departed in the CI's car. The FBI had equipped the car with recording devices. The recorded conversation revealed Newcomb sharing with Moran the plan to inject Driver's attacker with insulin and to stage his death. Newcomb said that he had two needles full of insulin ready to go in case they found the man. He further expressed a willingness to shoot Driver's attacker, "I mean if we have to do pow pow, we will, but I was trying to do it quietly, calls less attention to us." As they approached Palatka, Moran pondered whether they ought to turn off their cell phones.

When the men arrived, they observed an unusually large police presence in the area. The FBI arranged the show of force to protect Driver's attacker from the men. The men abandoned their plans and drove back to Newcomb's home.

After they returned home, the CI asked Driver if he still wanted the problem resolved. Driver wanted his attacker terminated. The CI told Driver he would hire a professional to take care of the problem and asked about Driver's work schedule "for alibi purposes."

The CI then reported back to the FBI. The FBI contacted Driver's attacker and obtained his cooperation to take a photograph that would make it appear that he had died from a gunshot wound to the chest. The FBI gave the photograph to the CI to prove that the attacker was dead.

The CI then showed the photograph to Moran, Newcomb, and Driver. Newcomb voiced his satisfaction with the apparent murder. Driver stated that the attacker's death was what he wanted and that he was happy with the outcome. The CI then showed the photograph to Moran. Moran exclaimed: "Ha-ha, oh, shit. Ha-ha, oh, shit. I love it . . . . good job." He boasted that the attacker's death resulted from a group effort between the CI, Newcomb, Driver, and himself. This was the last of the recorded conversations.

Besides the recorded conversations, the State presented testimony from the medical examiner. He confirmed that the plan to inject the attacker with insulin likely would have caused death. He opined that injecting a non-diabetic person with two vials of insulin would cause death and it would be difficult to determine the cause of death during an autopsy. The State closed its case.

Newcomb's counsel moved for a judgment of acquittal, asserting that the evidence did not show that Newcomb conspired with Moran and Driver to kill Driver's attacker. He also argued that there was no conspiracy because the CI was the only person who planned to commit the essential act of the conspiracy—murder. The motion was denied.

Newcomb's counsel renewed the motion for judgment of acquittal at the close of the defense's case. The trial court denied the motion. The jury found Newcomb guilty of conspiracy to commit first-degree murder. This appeal follows.

4

*Standard of Review*

We review a trial court's ruling on a motion for judgment for acquittal de novo. *Dunn v. State*, 206 So. 3d 802, 804 (Fla. 1st DCA 2016). If the State presents competent, substantial evidence to establish every element of the crime, then judgment of acquittal is improper. *State v. Odom*, 862 So. 2d 56, 59 (Fla. 2d DCA 2003).

*Analysis*

Newcomb contends that the trial court erred by denying his motion for judgment of acquittal. First, he argues that the evidence failed to show that he conspired to kill Driver's attacker. Second, he claims that there was no conspiracy because a necessary element of the conspiracy—the murder—was to be performed exclusively by the CI. We reject both arguments.

First, the State presented competent, substantial evidence to establish that Newcomb conspired with Moran and Driver to kill Driver's attacker. "A conspiracy exists where there is an express or implied agreement between two or more persons to commit a criminal offense and an intention to commit the offense. The fact-finder may infer the agreement from the circumstances; direct proof is not necessary." *Vasquez v. State*, 111 So. 3d 273, 275 (Fla. 2d DCA 2013) (internal citation omitted). And "[a] defendant may be found guilty of conspiracy if he had knowledge of the essential objective and voluntarily became a part of it, even if he lacked knowledge of all the details of the conspiracy or played only a minor role in the total operation." *Cummings v. State*, 514 So. 2d 406, 408 (Fla. 4th DCA 1987) (citing *United States v. Bascaro*, 742 F.2d 1335, 1359 (11th Cir. 1984)).

Newcomb knew the essential objectives of the conspiracy to kill Driver's attacker and fully intended to participate in the murder. Newcomb agreed with Driver and Moran that Driver's attacker needed to be put "six feet under." Newcomb and Moran spoke several times about the plot to kill the man. He was the one that contacted the CI and set the date for the group to drive to Palatka. Newcomb prepared to kill Driver's attacker by buying and cleaning special ammunition and by saving his wife's extra insulin to use as a murder weapon. Newcomb kept the insulin chilled so it

5

would not lose its potency and pre-loaded syringes with the drug. He was the first to suggest that they should snatch the man off street. He also engaged in discussions about staging the man's body to make it appear that he died while fishing. Viewed in the light most favorable to the State, the evidence was sufficient to allow the jury to conclude that Newcomb conspired to murder Driver's attacker. *See Bradley v. State*, 787 So 2d. 732, 740-41 (Fla. 2001) (concluding evidence was sufficient to find Bradley guilty of conspiracy to murder Mr. Jones where the testimony showed that Mrs. Jones wanted Mr. Jones dead, that Mrs. Jones and Bradley called each other right before and after the murder, and Bradley said he was expecting a payoff from Mrs. Jones).

Second, we reject Newcomb's argument that there could be no conspiracy because the CI was the only co-conspirator who intended to perform the essential objectives of the conspiracy. It is true that there can be no criminal conspiracy where two or more persons conspire with a government agent with the intention that "an essential ingredient of the offense is to be *performed by, and only by, such government agent.*" *Orantes v. State*, 452 So. 2d 68, 71 (Fla. 1st DCA 1984) (quoting *King v. State*, 104 So. 2d 730, 733 (Fla. 1957)) (emphasis added). But here, the CI was not the only person who agreed to participate in the murder. Newcomb made many statements and took several actions that showed his intent to participate in the murder of Driver's attacker.

Indeed, Newcomb was the person who kept in contact with the CI and made sure that the plan to murder Driver's attacker kept moving forward. He referred to the assault on Driver as "attempted murder" and expressed a willingness to do what he needed to do to protect his Klan family. Newcomb volunteered to walk up to the man and "put him out of his misery." He organized the men for the drive to Palatka for the sole purpose of finding Driver's attacker and murdering him. Newcomb brought his wife's insulin on ice to use as a murder weapon and had the syringes loaded and ready to use. If they could not get close enough to the man, Newcomb was willing to shoot the man with the ammunition he wiped clean of fingerprints. He even asked the CI to stop the car as they approached Palatka so he could have his guns ready. Viewed in the light most favorable to the State, the evidence was sufficient to allow the jury to conclude that the co-conspirators did

not intend that the essential objective of the conspiracy would be performed by and only by the CI. Rather, Newcomb and Moran, by their words and actions, showed they were prepared to participate in the murder of Driver's attacker. *See Orantes*, 452 So. 2d at 71 (holding that the rule announced in *King* did not apply when the evidence showed that a non-government agent conspired to commit all the elements of the charged offense).

Because there was competent, substantial evidence to support the charge of conspiracy to commit first-degree murder, the trial court did not err in denying the motion for judgment of acquittal. Newcomb's judgment and sentence are AFFIRMED.

ROBERTS and KELSEY, JJ., concur.

---

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

---

Charles M. Collins of Collins Law Firm, Monticello, for Appellant.

Ashley Moody, Attorney General, and Steven E. Woods, Assistant Attorney General, Tallahassee, for Appellee.

7